**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MEIKA BOYER,                                     )        CASE NO. 4:11-cv-1384
                                                 )
               Plaintiff,              )        JUDGE GAUGHAN
                                                 )
            v.                      )        MAGISTRATE JUDGE
                                                 )        VECCHIARELLI
MICHAEL J. ASTRUE,                               )
    Commissioner of Social Security,            )
                                                 )
              Defendant.              )        **REPORT AND RECOMMENDATION**

      Plaintiff, Meika Boyer ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying her

application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act").  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

On March 14, 2007, Plaintiff protectively filed an application for SSI and alleged a disability onset date of February 1, 2006.  (Tr. 10.)  The application was denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 10.)  On August 3, 2009, an ALJ held Plaintiff's hearing.  (Tr. 10.)  The ALJ continued the hearing so that Plaintiff could submit additional evidence.  (Tr. 10.)  Specifically, the ALJ provided Plaintiff the opportunity to obtain and submit "CPS records" to demonstrate proof of ongoing sobriety and/or compliance with mental health treatments during the time Plaintiff (1) asserted she was sober and compliant and (2) challenged the removal of her two children from her custodial care.  (Tr. 10.)

On October 19, 2009, the ALJ resumed Plaintiff's hearing.  (Tr. 10.)  Plaintiff appeared, was represented by counsel, and testified.  (Tr. 10.)  A vocational expert ("VE") also appeared and testified.  (Tr. 10.)  Plaintiff failed to present any records of her sobriety and compliance with mental health treatment, and she requested that the case proceed to decision without filing such records.  (Tr. 10.)

On December 3, 2009, the ALJ found Plaintiff not disabled as of March 14, 2007, the date Plaintiff filed her application.  (Tr. 33.)  On November 23, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 41.)  On June 7, 2011, the Appeals Council granted Plaintiff an extension of time to challenge the Commissioner's final decision.  (Tr. 1.)  On July 7, 2011, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)

2

On December 6, 2011, Plaintiff filed her Brief on the Merits.  (Doc. No. 14.)  On January 20, 2012, the Commissioner filed his Brief on the Merits.  (Doc. No. 15.)  On February 7, 2012, Plaintiff filed a Reply Brief.  (Doc. No. 17.)

Plaintiff asserts five assignments of error:  (1) the ALJ failed to determine that Plaintiff's borderline personality disorder was a severe impairment at step two of his analysis; (2) the ALJ failed to analyze Plaintiff's borderline personality disorder under 20 C.F.R. part 404, Subpart P, Appendix 1 ("the Listings"); (3) the ALJ failed to give good reasons for giving little weight to the opinions of Plaintiff's treating psychiatrist Dr. Kaza; (4) the ALJ's reasons for giving little weight to the opinions of examining psychologist Dr. Marshall are "unsound"; and (5) the ALJ failed to discuss the weight he gave to the opinions of examining psychologist Dr. Hewitt.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was 22 years old on the date she filed her application for disability benefits (Tr. 31) and 24 years old at the time of her hearing before the ALJ (Tr. 72). She has a high school education and is able to communicate in English.  (Tr. 32.)  She has past relevant work as a housekeeper/cleaner, fast food worker, telephone solicitor, and waitress.  (Tr. 31.)

### B.   Medical Evidence

It is not disputed that Plaintiff suffers low back pain with a herniated disc at L4-5 since January 2009, Hepatitis C, bipolar disorder, polysubstance abuse disorder, and a history of post traumatic stress disorder.  The disposition of Plaintiff's assignments of

error, however, relate only to her mental impairments and polysubstance abuse;

accordingly, the following summary of medical evidence will regard only those issues.

On June 21, 2004, Plaintiff presented to Dr. Anthony Golas, Ph.D., a

psychologist, for an evaluation.  (Tr. 340-49.)  Dr. Golas indicated that Plaintiff reported

the following.  Plaintiff's main complaints were of anxiety, Attention Deficit Disorder, and

scoliosis.  (Tr. 341.)  She was not able to work because of pain and numbness, poor

concentration, depression, and anxiety.  (Tr. 341.)  She did not consume alcohol or

"illicit psychoactive substances."  (Tr. 343.)  While she used alcohol when she was an

adolescent, she presently "totally abstains."  (Tr. 343.)  Dr. Golas reported that a Beck

depression inventory yielded a "Severe Depression" rating; a Burns anxiety inventory

yielded an "Extreme Anxiety' or "Panic" rating; and a working memory index test yielded

normal results.  (Tr. 345, 347.)  Dr. Golas diagnosed Plaintiff with Attention Deficit

Hyperactivity Disorder ("ADHD") per Plaintiff's reported history, an anxiety disorder not

otherwise specified, a depression disorder not otherwise specified, and a history of

postpartum depression.  (Tr. 348.)  He found that her social interactions and

concentration, persistence, and pace were within normal limits.  (Tr. 348-49.)  Dr. Golas

concluded that "[b]ased on the findings of this evaluation, the prognosis for

occupational rehabilitation appears to be fair."  (Tr. 348.)

On May 15, 2005, Plaintiff underwent an evaluation by Dr. Charles W. Hewitt,

Ph.D.  (Tr. 352.)  Dr. Hewitt's diagnoses of Plaintiff include a moderate to severe,

recurrent major depressive disorder; a mild generalized anxiety disorder; polysubstance

dependence; a history of ADHD; and a severe personality disorder with narcissistic,

passive-aggressive, and borderline features.  (Tr. 352.)  Dr. Hewitt assigned Plaintiff a

4

Global Assessment of Functioning ("GAF") score of 45.[1]  (Tr. 352.)  He further

explained that the "categorical features" of Plaintiff's personality disorder "are related to

emotional instability, poor social judgments, and multiple drug and alcohol abuse and

dependence," and that the "[i]nstability in [her] marital relationship and inadequate care

of her children [are] directly related to personality/characterological deficits."  (Tr. 353.)

Further, Plaintiff was "vulnerable to extreme emotional and behavioral disturbances . . .

seeks a hedonistic lifestyle while at the same time wanting to be an adequate parent

. . . [and] resists constructive change in favor of instability at home [and] in work

situations."  (Tr. 353.)

On February 16, 2006, Plaintiff underwent an evaluation with Dr. Michael J.

Marshall, Ph.D., a psychologist.  (Tr. 354-63.)  Dr. Marshall indicated that Plaintiff

reported the following.  She was sexually abused by two step-fathers when she was a

child, and she coped with the emotional trauma by taking drugs since the age of 13.

(Tr. 355, 356.)  She continued to use drugs until the age of 18, as well as between her

pregnancies.  (Tr. 356.)  Child Protection Services ("CPS"), however, had recently filed

charges against her for felony child abuse after a drug-using acquaintance of Plaintiff

reported that Plaintiff had been using drugs while she was pregnant.[2]  (Tr. 354.)  She

used heroine to self-treat back pain because her doctors would not prescribe opioid

---

[1] A GAF score between 41 and 50 indicates serious symptoms or a serious
impairment in social, occupational, or school functioning.  A person who scores
in this range may have suicidal ideation, severe obsessional rituals, no friends,
and may be unable to keep a job.  *See Diagnostic and Statistical Manual of
Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

[2] Plaintiff testified at her hearing that the charge of using heroin while pregnant
was eventually dropped.  (Tr. 103-04.)

5

pain relievers; and the only drug to which she was ever addicted was "Special K," which is a horse tranquilizer.  (Tr. 356.)  She never obtained treatment for drug addiction; she believed that she was not addicted to drugs because she could quit using them at any time; and she did not want to obtain treatment for drug addiction because she "just want[s] to move on."  (Tr. 356.)

Dr. Marshall concluded the following upon examination.  "Frankly, bizarre behavior was absent."  (Tr. 357.)  Plaintiff presented well-groomed, oriented, and attentive.  (Tr. 357.)  Dr. Marshall subjected Plaintiff to a test called the "Millon Clinical Multiaxial Inventory - III" and noted that the test was a "self-report test of major clinical and personality disorders."  (Tr. 358.)  Dr. Marshall concluded that Plaintiff "presented with a host of serious disorders," and "[t]he two most serious are bipolar disorder and borderline personality disorder."  (Tr. 362.)  Plaintiff required "intensive mental health services for at least the next few years in order to effectively treat her numerous conditions" and "needs to be on disability for the next year or two in order to focus on treatment."  (Tr. 362.)

On April 5, 2006, Plaintiff presented to Ms. Holly Coville, M.A., Ed.S., a licensed psychologist, for a consultative evaluation of her psychological functioning in relation to her second application for disability benefits.  (Tr. 368-75.)  Ms. Coville indicated that Plaintiff was the sole source of information upon which Ms. Coville based her assessment, and that there were no records for review.  (Tr. 368, 370.)  Ms. Coville further indicated that Plaintiff reported the following.  Plaintiff drank four bottles of a malted alcoholic beverage the night before the evaluation, but she was not intoxicated or "hung over" during the examination.  (Tr. 371.)  She drank alcohol only on the

6

weekends.  (Tr. 371.)  She had not used drugs since January 2006.  (Tr. 371.)

Ms. Coville reported the following upon physical examination.  Plaintiff was cooperative; her speech was relevant and coherent, but sometimes rambling; she was fully oriented; her mood was depressed; her affect was serious with some irritability; her concentration was within normal limits; her thought processes were spontaneous, relevant, and coherent; her thought content showed no evidence of delusions or obsessions; she had no apparent perceptual abnormalities; her insight was mildly to moderately deficient; her judgment was moderately to severely deficient; her memory was within normal limits; her persistence and pace were within normal limits; and her social functioning was at most mildly impaired.  (Tr. 373.)  Ms. Coville diagnosed Plaintiff with bipolar disorder, polysubstance abuse, anxiety disorder, and a personality disorder with borderline and antisocial features.  (Tr. 373.)  Ms. Coville noted she "suspects that [Plaintiff] is likely chemically dependent, particularly to alcohol and marijuana," and "[d]rug and alcohol-related issues could also fuel and exacerbate [Plaintiff's] mood features."  (Tr. 374.)  Her prognosis, however, was "fair."  (Tr. 374.)

On April 28, 2006, state agency psychologist Philip E. Comer, Ph.D., reviewed the record, performed a Psychiatric Review Technique, and assessed Plaintiff's mental residual functional capacity ("RFC") under Listing 12.04 regarding affective disorders, 12.06 regarding anxiety-related disorder, 12.08 regarding personality disorders, and 12.09 regarding substance addiction disorders.  (Tr. 376-93.)  Dr. Comer's mental RFC assessment is as follows.  Plaintiff was moderately limited in her abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being

7

distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 376-77.)  Plaintiff otherwise was not significantly limited.  (Tr. 376-77.)  Dr. Comer explained that Plaintiff had the mental and/or emotional capacity for substantial gainful activity commensurate with her education level in a low stress work environment that required only minimal interpersonal and/or social skills and good judgment.  (*See* Tr. 378.)

Dr. Comer indicated the following in his Psychiatric Review Technique.  Plaintiff had moderate restrictions in maintaining social functioning and mild restrictions in her activities of daily living and in maintaining concentration, persistence, or pace.  (Tr. 390.)  She had no episodes of decompensation that lasted for extended periods of time.  (Tr. 390.)  In short, Plaintiff's "several and interactive disorders and concomitant functional limitations do not meet or equal the listings but do call for a[n] rfc assessment."  (Tr. 392.)  Dr. Comer based his findings on Plaintiff's evaluation with Ms. Coville on April 5, wherein Plaintiff demonstrated that she could initiate and engage in adequate conversation with adequate eye contact notwithstanding that she presented sarcastic, serious, and depressed.  (Tr. 392.)

On June 17, 2006, Plaintiff presented to Northwood Health Systems for "crisis stabilization."  (Tr. 404.)  Ms. Rana Yahn, B.S., T.C.M., a clinician, attended to Plaintiff upon intake and indicated that Plaintiff reported the following.  (*See* Tr. 412.)  Plaintiff

8

was released from jail that day after fourteen days of incarceration for participating in a conspiracy to deliver heroin.  (Tr. 404.)  Within the past thirty days, she had used alcohol, heroin, Vicodin, Percocet, cocaine, and marijuana.  (Tr. 407.)  Plaintiff thereafter attended group therapy at Northwood with Dr. Leonard Wellman, a supervised psychologist; and for several months Dr. Wellman indicated that Plaintiff reported she was maintaining sobriety.  (*See* Tr. 462-71, 474-80, 482-89.)

On November 28, 2006, Ms. Penny Shepherd, M.E.D., a therapist, indicated that Plaintiff reported during a group therapy session that she was angry because her children were "taken away from her," and that she had just been released from jail for driving while under the influence.  (Tr. 515.)

On April 17, 2007, Plaintiff indicated on an information form for the Counseling Center that a month prior she experienced a lapse in time and memory from drinking alcohol.  (*See* Tr. 547.)  On May 8, 2007, Ms. Shirley Workman performed an initial psychiatric assessment of Plaintiff and indicated that Plaintiff was "clean" since June 13, 2006.  (Tr. 567.)  On July 31, 2007, Plaintiff presented to the hospital emergency department with a chief complaint that she ran out of her medication and "beats herself up" in the face.  (Tr. 569.)  A toxicology report was positive for THC.[3]  (Tr. 569.)

On August 18, 2007, state agency psychologist Frank Orosz, Ph.D., performed a Psychiatric Review Technique and mental RFC assessment of Plaintiff under Listings 12.02 regarding organic mental disorders, as well as under Listings 12.04 and 12.06. (Tr. 575-92.)  Dr. Orosz indicated the following in his mental RFC assessment.  Plaintiff

---

[3] THC stands for "tetrahydrocannabinol."  *Dorland's Illustrated Medical Dictionary* 1892 (30th ed. 2003).

was moderately limited in her abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  (Tr. 575-76.)  She otherwise was not significantly limited.  (Tr. 575-76.)

Dr. Orosz indicated the following in his Psychiatric Review Technique.  Plaintiff was moderately restricted in maintaining social functioning and in concentration, persistence, or pace; and she was mildly restricted in her activities of daily living.  (Tr. 589.)  She had no episodes of decompensation.  (Tr. 589.)

Dr. Orosz noted that Plaintiff had a history of using heroin, "acid," "crack," cocaine, marijuana, and alcohol; and concluded that "[i]f she should remain clean from substances she would be able to manage working in a low stress environment that does not require working at a fast pace or close contact with others."  (Tr. 577.)  On April 21, 2008, state agency psychologist Catherine Flynn, Psy.D., affirmed Dr. Orosz's findings.  (Tr. 607.)

On February 12, 2008, Plaintiff presented to Dr. Madhubala A. Kothari , M.D. for counseling.  (6000-06.)  Dr. Kothari indicated the following.  Plaintiff was pregnant and smoked marijuana the day before.  (Tr. 603.)  Her speech was fluent, clear, and

coherent and her memory was intact; but she presented sad, depressed, and tearful. (Tr. 605.)  Dr. Kothari's diagnoses included borderline personality disorder; and Dr. Kothari assigned Plaintiff a GAF score of 50.  (Tr. 605.)

On July 25, 2008, Ms. Amy S. Frampton, a licensed social worker, authored an assessment of Plaintiff's mental ability to do work-related activities and indicated the following.  (Tr. 937-38.)  Plaintiff had a poor ability to follow work rules; deal with the public; interact with supervisors; deal with work stress; maintain attention or concentration; understand, remember, and carry out simple, detailed, or complex instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability.  (Tr. 937-38.)  She had a fair ability to relate to co-workers; use judgment; function independently; and maintain her personal appearance.  (Tr. 937-38.)  Ms. Frampton further reported the following.  Plaintiff had a history of bipolar disorder and a limited intellectual ability, although her memory was fair.  (Tr. 938.)  She "has not had her medication" and "has erratic mood swings" and anxiety.  (Tr. 938.)  Plaintiff "would not respond well to work peers or pressures[;] she would have extreme absences due to her illness[; and s]he would not be able to use good judgment or good decision making."  (Tr. 938.)

On September 12, 2008, Plaintiff underwent a psychological evaluation by Dr. Richard Ajayi, M.D., at the request of "Dr. Madhu Aggarwal" for depression after she gave birth to her daughter.  (Tr. 804.)  Plaintiff's chief complaint was that she had bipolar disorder.  (Tr. 804.)  Dr. Ajayi indicated the following.  Plaintiff was "laying calmly in bed holding her baby on her chest [and did] not appear to be in any kind of distress." (Tr. 805.)  Further, "[h]er speech was clear [and] coherent," and " her thought process

11

[was] rational and logical." (Tr. 805.) Dr. Ajayi summarized that "[a]t this point [she was] not psychiatrically acute." (Tr. 805.)

On April 27, 2009, Plaintiff presented to Dr. David Okonkwo, M.D., Ph.D., a neurologist, for a consultative examination of neck and back pain. (Tr. 641-42.) Dr. Okonkwo referred Plaintiff to a pain management specialist. (Tr. 642.) Later that day, Plaintiff presented to the emergency department seeking medication for her pain. (Tr. 813.) Dr. Michael L. Schreiber, D.O., and Ms. Noreen Nortier, PA-C, attended to Plaintiff and indicated Plaintiff reported Dr. Okonkwo sent her to the emergency department for medication. (Tr. 813.) They further indicated that, upon calling Dr. Okonwko's office by telephone, Dr. Okonkwo's assistant reported Plaintiff saw Dr. Okonkwo that morning but Dr. Okonkwo did not prescribe Plaintiff medication and did not send her to the emergency department. (Tr. 814.)

On June 19, 2008, a licensed social worker[4] indicated that Plaintiff reported her social functioning was "fair," although she did not like being around people. (Tr. 621.)

On June 22, 2009, Plaintiff presented to Dr. Okonkwo for a follow-up on her back and neck pain. (Tr. 925.) Dr. Okonkwo indicated that he was "very concerned that [Plaintiff's] pain syndrome is out of proportion to her radiographic findings" and that "it may be appropriate to consider referring her to . . . a psychiatrist . . . who specializes in patients with pain syndromes." (Tr. 925.)

Plaintiff testified at her hearing that she began psychiatric treatment with a "Dr. Kaza" in October or November of 2009 (Tr. 81); however, Plaintiff's attorney conceded

_____

[4] The record does not clearly indicate the name of the licensed social worker. (*See* Tr. 630.)

that the record contained few treatment records from Dr. Kaza (Tr. 70-71).[5]  The record

indicates that Dr. K.A. Kaza, M.D., a psychiatrist, performed a Mental Capacities

Evaluation of Plaintiff some time in 2009, wherein he indicated the following.[6]  (Tr. 810.)

Plaintiff had moderate restrictions in her activities of daily living; and marked restrictions

in her abilities to maintain social functioning and concentration, persistence, or pace.

(Tr. 810.)  Regarding episodes of decompensation within a 12 month period, each of at

least two weeks in duration, Dr. Kaza checked a box representing "marked" restrictions.

(Tr. 810.)  Further, Plaintiff had a GAF score of 50; her mental impairments "may"

exacerbate her experience of back pain; she could be expected to be absent from work

more than four days per month because of her psychological impairments or treatment;

and her impairments lasted or could be expected to last for at least 12 months.  (Tr.

810.)

On August 2, 2009, Dr. Kaza authored letter titled "Medical Source Statement

Concerning Drug and/or Alcohol Abuse Material to the Severity of an Individual's

Impairment(s)" and stated that "[i]t is [his] medical opinion that [Plaintiff] is currently

disabled and is expected to be disabled for the next 12 months."  (Tr. 891.)  Dr. Kaza

continued that "[a]ny drug and/or alcohol abuse is not a contributing factor material to

---

[5]  Counsel indicated that Plaintiff had requested additional records from Dr. Kaza
and had not received them.  (Tr. 71.)  Nevertheless, counsel indicated that he
did not anticipate the need to include additional records after the close of
Plaintiff's testimony.  (Tr. 67.)

[6]  The ALJ believed Dr. Kaza performed the Mental Capacities Evaluation on July
1, 2009.  (Tr. 23.)  Plaintiff contends that Dr. Kaza performed the evaluation on
February 1, 2009.  A review of the record reveals that the date is not clear, as it
is written faintly and in a sloppy manner.  (*See* Tr. 810.)

[his] disability determination" and "[a]bsent of any drug and/or alcohol abuse, [Plaintiff] would still be limited from performing any substantial gainful activity on a sustained basis."  (Tr. 891.)

On September 9, 2009, Plaintiff presented to the University of Pittsburgh Medical Center for a follow-up on her back pain.  (Tr. 933.)  Dr. Edward Heres, M.D., attended to Plaintiff and indicated that Plaintiff presented with no emotional distress.  (Tr. 933.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Hearing Testimony

Plaintiff testified at her hearing as follows.  She had not used heroin since June 13, 2006.  (Tr. 79-80.)  She had not used marijuana since April or May of 2007.  (Tr. 80.)  She obtained mental health treatment from Dr. Kaza and Ms. Frampton.  (Tr. 80-81.)  Both were associated with Comprehensive Behavioral Health.  (Tr. 82.)  She saw Dr. Kaza once a month for 15 minutes to half an hour at a time; and Dr. Kaza counseled her and gave her prescription medication.  (Tr. 81.)  Dr. Kaza prescribed Plaintiff Xanax, Valium, Adderall, Geodon, Effexor, and Neurotonin.  (Tr. 85-86.)  Plaintiff's medications made her tired or sleepy and sometimes made her hallucinate.  (Tr. 86-87.)  Ms. Frampton was her therapist; and Plaintiff usually presented to Ms. Frampton once or twice a month but had seen her "a lot lately."  (Tr. 81-82.)

Plaintiff believed that her borderline personality disorder and bipolar disorder were her most significant problems.  (Tr. 87.)  Those conditions made her feel there were "two of her."  (Tr. 88.)  One of her was "nice," the other was "mean," and the two "conflict[ed] with each other all the time in [her] head."  (Tr. 88.)  Her medicine "help[ed]

14

somewhat." (Tr. 88.)

Plaintiff's typical day proceeded as follows.  She would wake up, eat breakfast, take her medicine, and try to stay awake.  (Tr. 88.)  Her husband followed her around the house to ensure that she did not hurt herself because she could not stay awake. (Tr. 88.)  If she watched the television or used the computer, she would fall asleep.  (Tr. 88.)  She took two or three naps throughout the day.  (Tr. 97.)  She sometimes could perform normal chores around her house, but her ability to do so depended on how much pain she suffered at that time.  (Tr. 88.)  She could manage her own money and pay her own bills.  (Tr. 88.)  She did not like to leave her home unless it was necessary (*e.g.*, to go grocery shopping) because she was afraid someone would try to hurt her. (Tr. 89.)  She did not have a car and relied on her mother-in-law to take her places.  (Tr. 88.)

When she worked, she had problems getting along with others.  (Tr. 90.)  She did not like people talking to her, "knowing [her] business," and "trying to bother [her]." (Tr. 90.)  She preferred that "everybody just leave [her] alone."  (Tr. 90.)

Plaintiff attempted to commit suicide "a couple of days ago" by cutting her wrists. (Tr. 99.)  She did not seek medical attention because she thought she would be put in a "psych unit" again[7] and miss her hearing.  (Tr. 99.)  She also had "mood swings" where she would "flip out" and "beat herself up."  (Tr. 100.)

Although Plaintiff had an extensive history of drug abuse, she used heroin, "acid," "crack," cocaine, marijuana, and alcohol only when she was a teenager and

---

[7] Plaintiff testified that she had been placed in "psych units" at least five times in the past.  (*See* Tr. 99.)

15

before she had children.  (Tr. 106.)  Plaintiff's two oldest children were removed from

her custody by CPS because someone tried to strangle her daughter when her

daughter was two months old, not because Plaintiff had a problem abusing drugs.  (Tr.

106.)  All of the allegations in the record that Plaintiff abused drugs were incorrect.  (Tr.

107.)

### 2.    Vocational Expert's Hearing Testimony

The ALJ posed seven hypotheticals to the VE.  (*See* Tr. 120-27.)  The ALJ's first

hypothetical is as follows:

> I want you to assume that [Plaintiff] could perform medium exertional work
> as defined by the statute, that's occasionally lif[t] and/or carry 50 pounds;
> frequently lift and/or carry 25 pounds; stand/or [sic] walk with normal breaks
> through the eight-hour workday.
>
> I also want you to assume that posturally she could occasionally climb
> ladders, ropes and/or scaffolds; occasionally climb ramps and/or stairs;
> occasionally balance, stoop, kneel, crouch, and/or crawl.  For environmental
> limits, I want you to presume that she should avoid concentrated exposure
> . . . to extreme heat and/or extreme cold and avoid concentrated exposure
> to workplace hazards such as dangerous moving machinery, unprotected
> heights.
>
> For mental limitations, I want you to assume that work should be limited to
> simple, and that being one-to three-step routine and repetitive tasks
> performed at a low-stress work environment, and I'll define that as free from
> fast-paced or strict production quotes with only occasional interaction with
> the public or coworkers.

(Tr. 120-21.)  The VE testified that such a person could perform Plaintiff's past relevant

work as a housekeeper/cleaner.  (Tr. 121.)  She also would be able to perform other

work as a dining room attendant (for which there were 339,588 jobs in the national

economy and 1,610 jobs in the local economy), kitchen helper (for which there were

381,127 jobs in the national economy and 1,919 jobs in the local economy), and

equipment cleaner (for which there were 200,688 jobs in the national economy and 1,082 jobs in the local economy).  (Tr. 121-22.)

The ALJ's second hypothetical is as follows:

I want you to assume RFC No. 1 in its entirety, but I want you to also add an environmental limitation that because of a diagnosis of hepatitis C, [the person] must avoid exposure to food contamination. She can't be in a position where she contaminates food or contaminates blood in essence to endanger others because of her hepatitis C diagnosis.

(Tr. 122.)  The VE testified that such a person still could perform Plaintiff's past relevant work as a housekeeper/cleaner but would be precluded from performing other work as a dining room attendant and kitchen helper.  (Tr. 123.)  The VE further testified that such a person still could perform other work as an equipment cleaner, hand packager (for which there were 242,081 jobs in the national economy and 248 jobs in the local economy), and machine feeder (for which there were 59,300 jobs in the national economy and 116 jobs in the local economy).  (Tr. 123.)

The ALJ's third hypothetical is as follows:

I want you to assume that the exertional level has changed from medium to light as defined by the statute, light meaning occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand and/or walk with normal breaks for about six hours in an eight-hour workday; sit with normal breaks for about six hours in an eight-hour workday.  If you make that assumption under RFC No . 3, and you assume that the postural environmental and mental limits in RFC 1 and 2 carryover into RFC No . 3, the first question is would there be past work that [Plaintiff] could perform?

(Tr. 123-24.)  The VE responded that such a person still could perform Plaintiff's past relevant work as a housekeeper/cleaner, and additionally could perform other work as a mail clerk (for which there were 70,832 jobs in the national economy and 399 jobs in the local economy) and sewing machine operator (for which there were 60,507 jobs in

17

the national economy and 195,000 jobs in the local economy[8]).  (Tr. 129.)

The ALJ's fourth hypothetical is a follows:

I want you to assume RFC No. 3 in its entirety, but I want you to add a sit/stand option that Ms. Boyer could exercise once an hour throughout the workday in addition to her normal breaks.

(Tr. 125.)  The VE testified that such a person would not be able to perform Plaintiff's

past relevant work, but still would be able to perform other work as a mail clerk and

sewing machine operator.  (Tr. 125.)  The ALJ's fifth hypothetical is as follows:

I want you to assume RFC No.4 in its entirety, but I'm going to change the mental limitations a little bit. Instead of only occasional interaction with the public or coworkers, no interaction with the public and only occasional interaction with supervisors or coworkers with a preference for independent work in the sense that instead of doing tandem tasks with other co-workers to basically be given a task and be doing it on her own.

(Tr. 125.)  The VE testified that such a person still would be able to perform other work

as a mail clerk and sewing machine operator.  (Tr. 126.)  The ALJ's sixth hypothetical is

as follows:

Let's say RFC No.6, the exertional level has changed from light to sedentary as defined by the statute, that being occasionally lift and carry 10 pounds; frequently lift and carry five pounds or less; stand and/or walk for two hours out an of eight-hour workday, sit for at least six hours in an eight-hour workday with normal breaks, if you make that change in the exertional under RFC No. 6 and you carryover into RFC No. 6 all other limitations that were contained in RFC No. 5 would there be any jobs available?

(Tr. 126.)  The VE responded that such a person could perform other work as a

document preparer (for which there were 143,297 jobs in the national economy and 688

jobs in the local economy) and table worker (for which there 10,110 jobs in the national

---

[8]  The transcript of Plaintiff's hearing appears to be in error, as it reflects that there are more jobs in the local economy than in the national economy.

economy and 68 jobs in the local economy).  (Tr. 126.)

Finally, the ALJ's seventh hypothetical is as follows:

For RFC No.7, I want you to assume that all the testimony that you've heard today from Ms. Boyer would be deemed fully credible about her pain complaints and functional limitations, and I'm just going to give a couple of examples because she testified for almost 50 minutes.  She experiences fatigue and hallucinations from her prescribed medication, and as a result, she cannot function on a daily basis.

She doesn't sleep well at night on many nights, and as a result, she needs to sleep during the day, and her naps are from one to two hours at a time.  She doesn't like to be around people.  She experiences a lot of pain in her back and hips and arms.  She can only walk for two blocks at a time, lift less than 20 pounds, experiences difficulty reaching overhead and finds it also difficult, for example, to bend over. If you make these assumptions of credibility regarding these samples of testimony as well as all the other testimony that was provided, and assume, for the sake of this question, that the testimony is fully supported by the evidence, would there be jobs that [Plaintiff] could perform either that we've talked about or otherwise?

(Tr. 127.)  The VE responded that such a person would not be able to perform any

work.  (Tr. 127.)

Upon questioning from Plaintiff's counsel based on Dr. Kaza's opinions, the VE

testified that an individual who was absent from work more than four days a month

would be precluded from any work.  (Tr. 128.)  The VE further testified upon counsel's

questioning that an individual who was "off pace" for a third of the work day, not

including regular breaks and lunch, would be precluded from performing any work.  (Tr.

128.)

The VE concluded that his testimony was consistent with the Dictionary of

Occupational Titles and its companion publication, and was based in part on his expert

experience.  (Tr. 128-29.)

19

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and*

416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her

past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

prevent her from doing her past relevant work, if other work exists in the national

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§

404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ, after writing an extensive and through opinion, made the following

findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since March 14, 2007, the application date.

2.    The claimant has the following severe impairments:  low back pain, mostly in the sacral area, with low back disc herniation at L4-5 as of January 2009; Hepatitis C positive; Bipolar Disorder; history of Post-Traumatic Stress Disorder; and Polysubstance Abuse.

3.    The claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, the undersigned finds that, during the period from August 1, 2002 through April 26, 2009, the claimant had the residual functional capacity to perform medium work . . . except that she should only occasionally climb ladders, ropes, scaffolds, ramps and stairs; stoop; kneel; crouch; and crawl.  She should avoid concentrated exposure to extremes of cold and heat and to work place hazards such as dangerous moving machinery and unprotected heights. The claimant would be limited to performing simple (e.g.[,] one to three step) routine and repetitive tasks performed in a low stress work environment  (i.e., free from fast-paced production or strict production quotas).  She should have no more than occasional interaction with the public and co-workers.  Due to her diagnosis of Hepatitis C, the claimant must avoid jobs that risk food or blood contamination.

The undersigned finds that the claimant's physical condition had worsened by April 27, 2009.  Beginning on that date, and continuing until the date of this decision, the claimant has had the residual functional capacity to perform light work . . . except that she should only occasionally climb ladders, ropes, scaffolds, ramps and stairs; stoop; kneel; crouch; and crawl.  The claimant would need to be able to change positions between sitting and standing once per hour throughout an eight hour workday.  She should avoid concentrated exposure to extremes of cold and heat and to work place hazards such as dangerous moving machinery and unprotected heights.  The claimant would be limited to performing simple (e.g.[,] one to three step) routine and repetitive tasks performed in a low stress work environment  (i.e., free from fast-paced production or strict production quotas).  She should have no more than occasional interaction with the public and co-workers.  Due to her diagnosis of Hepatitis C, the claimant must avoid jobs that risk food or blood contamination.

5.  Prior to April 27, 2009, the claimant was capable of performing past relevant work as a housekeeper/cleaner.  This work does not require the performance of work-related activities precluded  by the claimant's residual functional capacity.

6.  Beginning on April 27, 2009, the claimant was unable to perform any past relevant work.

. . . . .

9.  Transferability of job skills in not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills.

10.  Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform beginning on April 27, 2009.

11.  The claimant has not been under a disability, as defined in the Social Security Act, since March 14, 2007, the date the application was filed.

(Tr. 12-33.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

22

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.  *Shinseki v. Sanders*, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009).

**B.     The ALJ's Consideration of Plaintiff's Borderline Personality Disorder**

23

Plaintiff contends that the ALJ erred by failing to deem her borderline personality disorder a severe impairment and analyze it under Listing 12.08.  For the following reasons, any error on the part of the ALJ in concluding Plaintiff's personality disorder was not severe would be, at most, harmless error; and the ALJ's failure to analyze Plaintiff's personality disorder explicitly under Listing 12.08 does not warrant remand in this case.

Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  All of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process.  *See* 20 C.F.R. § 404.1545(e).

The ALJ considered Plaintiff's personality disorder in his disability determination.

The ALJ extensively reviewed Plaintiff's medical records in his step two analysis and observed that Plaintiff has been diagnosed with a personality disorder on many occasions.  (*See* Tr. 12-13, 17-18, 20-22.)  He also observed that Plaintiff believed she was disabled particularly by her personality disorder.  (Tr. 28.)  The ALJ did not, however, find that Plaintiff's personality disorder was severe.  Rather, the ALJ found that Plaintiff suffered the following severe impairments:  low back pain, mostly in the sacral area, with low back disc herniation at L4-5 as of January 2009; Hepatitis C positive; Bipolar Disorder; history of Post-Traumatic Stress Disorder; and Polysubstance Abuse.  Nevertheless, upon the ALJ's finding of these severe impairments, Plaintiff cleared step two of the disability analysis.  *See Anthony*, 266 F. App'x at 457.

At step three, the ALJ stated that Plaintiff's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.09."  (Tr. 25.)  He did not analyze Plaintiff's mental impairments under Listing 12.08.  Listing 12.08 regards personality disorders and provides the following:

> A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:
>
> 1. Seclusiveness or autistic thinking; or
>
> 2. Pathologically inappropriate suspiciousness or hostility; or

25

3. Oddities of thought, perception, speech and behavior; or

4. Persistent disturbances of mood or affect; or

5. Pathological dependence, passivity, or aggressivity; or

6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

Listing 12.08.  The ALJ did not explicitly address the "A" criteria in his opinion; however, he addressed the "B" criteria in his analysis of Listings 12.04, 12.06, and 12.09.  (*See* Tr. 25-26.)  Specifically, he found that Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in her social functioning; moderate difficulties in her concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (Tr. 25-26.)  Plaintiff has not taken issue with these findings.  As Plaintiff must meet both the "A" and "B" criteria under Listing 12.08, and Plaintiff has not disputed or shown that she meets the "B" criteria, there is no basis to conclude that she meets or medically equals that Listing.

Further, the ALJ found that, "[i]n terms of [Plaintiff's] alleged mental impairments . . . [her] testimony regarding the limiting effects of [the] impairments is not fully credible or consistent with the objective medical signs and findings."  (Tr. 30.)  Plaintiff has not

26

taken issue with the ALJ's assessment of her credibility and challenged the evidence upon which it is based.

Courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  Plaintiff has not provided an adequate basis to conclude that remand for the ALJ to more fully explain his Step Three analysis of Plaintiff's personality disorder might lead to a different result.  Accordingly, this assignment of error is not well taken.

### C.    The ALJ's Assessment of Plaintiff's Treating and Examining Psychiatrists

Plaintiff contends that the ALJ failed to give good reasons for giving little weight to the opinions of her treating psychiatrist, Dr. Kaza; failed to give "sound" reasons for giving little weight to the opinions of examining psychiatrist Dr. Marshall; and failed to explain the weight he gave to the opinions of examining psychiatrist Dr. Hewitt.  For the following reasons, these assignments of error are not well taken.

An ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. §

404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

To the extent Dr. Kaza and Dr. Marshall opined Plaintiff was disabled, the ALJ properly rejected those opinions because statements from any medical source that the claimant is "disabled" or "unable to work" are not medical opinions, but are rather comments on a determination reserved for the Commissioner and, therefore, not entitled to controlling weight or special significance.  20 C.F.R. § 404.1527(e); S.S.R 96-5p, 1996 WL 374183, at *1 (1996); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

The ALJ gave little weight to Dr. Kaza's opinions because:

- "Dr. Kaza provided no explanation for any of the limitations set forth in his opinions";

- He "failed to explain how the claimant's drug and alcohol addiction and her choices to stop all of her medications during pregnancies impacted . . . her behavior";

- "Dr. Kaza also failed to provide any of his own treatment notes to support his opinion"; and

- "He did not address the claimant's other medical records, including Dr. Okonkwo's deep concern that the claimant was engaging in somatoform behaviors that were not being addressed or treated."

28

(Tr. 23, 30.)  Plaintiff contends that the ALJ's reasons for rejecting Dr. Kaza's opinions are not "good reasons" because they are based on a misconstruction the record. Specifically, Plaintiff contends that the record contains various documents with Dr. Kaza's initials or handwriting that support his opinions (*see* Tr. 614-15, 618, and 893); Dr. Kaza explained how Plaintiff's drug and alcohol addiction impacted Plaintiff's behavior, as he mentioned that Plaintiff's drug and/or alcohol use was not a contributing factor material to his disability determination; and the ALJ's observation that Dr. Kaza failed to consider Dr. Okonkwo's opinion of Plaintiff's potential somatoform disorder is not a fair basis for his credibility assessment because Dr. Okonkwo offered that opinion only *after* Dr. Kaza rendered his opinions.  For the following reasons, these contentions are not well taken.

The ALJ accurately concluded that Dr. Kaza'a opinions were unsupported by treatment notes.  Some of the documents to which Plaintiff cites consist of a mere list of medications (*see* Tr. 616-15); other documents do not indicate that they were authored or prepared by Dr. Kaza (*see* Tr. 618); and none of the documents provide information on the extent to which Plaintiff is limited.[9]  Although Dr. Kaza mentioned that he believed Plaintiff's drug and/or alcohol abuse was not a contributing factor material to his disability determination, the ALJ accurately observed that Dr. Kaza did not provide an explanation for that conclusion.  Finally, the ALJ's observation that Dr. Kaza failed to account for Dr. Okonkwo's opinion is valid, as Dr. Kaza authored his August 2, 2009,

_____

[9] To the contrary, one document indicates that Plaintiff's condition upon presentation essentially was "normal" and "fair."  (*See* Tr. 893.)

letter two months after Dr. Okonkwo suggested Plaintiff might suffer a somatoform disorder and Dr. Kaza made no mention of Dr. Okonkwo's opinion in the letter.  In short, the ALJ's assessment of the record is accurate, and the ALJ's conclusion that Dr. Kaza's opinions were unsupported constitutes a "good reason" for giving those opinions less than controlling weight.

The ALJ gave little weight to Dr. Marshall's opinions because:

- "[H]e did not consider the effect of the claimant's drug and alcohol abuse upon [Plaintiff's] limitations";

- "[H]is opinion is not fully consistent with the objective findings upon mental status testing";

- [I]t appears that his recommendation for short-term disability was based in large part on the fact that [Plaintiff] was pregnant, unemployed, and having financial difficulties"; and

- [H]is opinion that the claimant should be on disability for a year or two is an opinion on an issue reserved to the Commissioner."

(Tr. 18, 31.)  Plaintiff contends that the ALJ's reasons for giving Dr. Marshall's opinions little weight were "unsound" because they misconstrue the record.  Specifically, Plaintiff contends:  (1) Dr. Marshall did consider the effect of Plaintiff's substance abuse on her limitations, as he explained that Plaintiff was "unknowledgeable about substance abuse" and "[h]er condition [was] compounded by suffering from multiple serious mental conditions" (Pl.'s Br. 17, *citing* Tr. 362); and (2) Dr. Marshall's opinions were consistent with his findings upon examination.  For the following reasons, these contentions are not well taken.

Dr. Marshall's opinion, to which Plaintiff cites, is fully set forth as follows:

[Plaintiff] is very psychologically naive about her emotional condition and unknowledgeable about substance abuse.  Her condition is compounded by

suffering from multiple serious mental conditions.

(Tr. 362.)  These statements do not support the conclusion, as Plaintiff contends, that Dr. Marshall considered the effect of Plaintiff's substance abuse on her limitations. Further, the ALJ's finding that Dr. Marshall's opinions were inconsistent with his objective findings on examination is accurate, as Dr. Marshall reported that Plaintiff presented well and exhibited no bizarre behavior, which contrasts the severity of his findings upon administering a test based on Plaintiff's subjective reports of her condition.

Finally, the ALJ discussed Dr. Hewitt's opinions at length and observed that Dr. Hewitt noted Plaintiff's "Personality Disorder was related to emotional instability, poor social judgment, and multiple drug and alcohol abuse and dependence."  (Tr. 17.)  The ALJ did provide an explanation of any weight he gave to Dr. Hewitt's opinions.  But Dr. Hewitt did not offer an opinion of the extent to which Plaintiff was limited.  Further, an ALJ need not "make explicit credibility findings as to each bit of conflicting testimony[] so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (per curiam) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)). The ALJ's assessment of the record evidence supports the conclusion that, despite Plaintiff's severe mental impairments, Plaintiff has the ability to perform a limited range of work that exists in significant numbers in the national economy.

In short, for the reasons set forth above, Plaintiff's contentions that the ALJ failed to assess the opinions of Dr. Kaza, Dr. Marshall, and Dr. Hewitt properly are not well taken.

31

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  May 31, 2012

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of this notice.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**